NATIVE ECOSYSTEMS COUNCIL; Montana Ecosystems Defense Council, Plaintiffs,

v.

Faye KRUEGER, Regional Forester of Region One of the U.S. Forest Service; United States Forest Service, an agency of the U.S. Department of Agriculture; and U.S. Fish and Wildlife Service, an agency of the U.S. Department of Interior, Defendants.

No. CV 14–196–M–DLC.

United States District Court, D. Montana, Missoula Division.

Signed Aug. 27, 2014.

Guy R. Knudsen, Northwest Natural Resource Advocates, Pullman, WA, Robert M. Gentry, Robert Gentry Law, Missoula, MT, for Plaintiffs.

Jeremy S. Hessler, U.S. Department of Justice, Washington, DC, for Defendants.

## ORDER

DANA L. CHRISTENSEN, Chief Judge.

Plaintiffs Native Ecosytems Council and Montana Ecosystems Defense Council move the Court for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs seek to enjoin all activities authorized by the U.S. Forest Service's April 7, 2014 Decision Notice for the Red Mountain Flume Chessman Reservoir Project. For the reasons explained, the motion is denied.

### Background

Since 2006, the Helena National Forest has been subjected to a massive Mountain Pine Beetle infestation which has left a vast sea of standing dead trees throughout the Forest. The beetle-killed trees have begun falling and 90% of them are predicted to fall within the next 5 to 10 years. This situation has led to massive fuel loading on the forest surface which, according to fire scientists, presents a dangerous situation for high intensity wildfires, as well as complications for fighting any fires that may ignite.

The Chessman Reservoir sits in the southern portion of the Helena National Forest and is the primary water source for the City of Helena. The Red Mountain Flume is a 4.8 mile structure that drains water from local streams into the Chessman Reservoir. The Flume is constructed with materials that can be damaged in fire, including wooden trestles and sheet metal.

Both the reservoir and the flume are surrounded by extensive stands of beetle-killed lodge pole pine forest. As in other areas of the Forest, the beetle-killed trees around the reservoir and flume have begun falling and are predicted to continue to fall over the course of the next several years. As a result, fuel loads on the forest floor surrounding the Chessman Reservoir and the Flume are very high and will continue to increase as the dead trees continue to fall.

The elevated fuel loads present the possibility of dangerous and intense wildfire with the potential to damage soils and to produce erosion and large infusions of post-wildfire ash into the reservoir. The infusion of large amounts of wildfire ash and other sediment into the reservoir could only be dealt with by the City of Helena through exceedingly expensive treatment efforts and the purchasing of water from other sources. Other cities in western states have experienced severe and expensive damage to their water supply as a result of large post-wildfire ash infusions.

The falling trees have also damaged and threaten to damage the Flume's structure and a fence that surrounds the reservoir. The fence surrounding the reservoir is in place to prevent local cattle from grazing in or around the reservoir, which could potentially introduce infectious, fecal-borne pathogens into the water supply, and, in fact, breaks in the fence from fallen trees

have resulted in incursions by cattle into the area around the reservoir. Currently, the City of Helena is not equipped to eliminate all such pathogens from the water supply, and an expensive upgrade would be necessary if such pathogens were introduced.

The Project authorized by the Forest Service is designed to address this situation and to protect Helena's municipal water supply. The Project authorizes approximately 490 acres of clearcutting, fuel break treatment, and prescribed burning around the Chessman Reservoir and alongside the Flume. The fuel break treatments alongside the flume will occur approximately 100′ out from the Flume on the uphill side and 300′ from the Flume on the downhill side. The resulting buffer alongside the Flume will total 158 acres. The proposed treatment of these units would leave some remaining trees, but not so many as to undermine the goal of creating an effective fuel break for protection of the Flume.

The treatment units surrounding the reservoir would generally be subjected to "clearcut with leave tree and improvement cuts." (Doc. 23 at 10.) The six treatment units range in size from 9 to 68 acres, for a total of approximately 317 acres. Again, some healthy trees would be retained in each unit, but the result will generally be an open-story to unforested area. Harvest of certain trees such as whitebark and ponderosa pine will be avoided as will harvest around riparian areas. In addition, strips and clumps of surviving trees adjacent to the reservoir will be retained to provide wildlife cover. Heavy fuels from the forest floor will be removed.

The Project Area[1] is located about 30 miles south and outside of the Northern Continental Divide Ecosystem grizzly bear recovery zone ("NCDE"). The grizzly bear population in the NCDE is growing at an estimated rate of 3% per year and is characterized by high genetic diversity. The bears in the NCDE are expanding their range south. While there is no direct evidence that grizzly bears inhabit or move through the Project Area, Forest Service biologists assume that grizzly bears from the NCDE occasionally move through the Area.

The Project Area is not in designated lynx critical habitat. Canada lynx distribution and abundance is tied primarily to that of its principal prey, the snowshoe hare which prefers moist, multi-storied boreal forests. While lynx are abundant in the boreal forests of Alaska and Canada, they appear in lesser numbers in the northern and central Rocky Mountains. In Montana, lynx population numbers are higher in the northwestern part of the state where habitat conditions are moister and more suitable. The Project Area is considered "secondary occupied" lynx habitat, as opposed to "core occupied" habitat, and lynx primarily use this landscape as a travel corridor. Two to three individual lynx have been identified as residents of the 149,240 acre Continental Divide Landscape within which the Project Area is situated. No lynx or sign of lynx have been observed in the Project Area. However, as with grizzly bears, Forest Service wildlife biologists assume that lynx occasionally move through the Project Area. The Project Area supports little functional snowshoe hare habitat and most of this "is highly fragmented in relatively small, isolated patches." (Doc. 21 at 30.)

Wolverines have not been observed in the Project Area, despite extensive DNA tracking surveys. Biologists have identified two male wolverines that range over

---

1. The Project Area includes 4,760 acres surrounding the proposed treatment units.

the Continental Divide Landscape. Due to their wide range, it is supposed that wolverines "probably pass through the area on occasion in the course of their normal wanderings." (Doc. 21 at 37.) Elk populations in and around the Project Area exceed, by a wide margin, Montana's elk population targets.

## Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24, 129 S.Ct. 365. A petitioner seeking an injunction must show that (1) it is likely to suffer irreparable harm absent a preliminary injunction, (2) it is likely to succeed on the merits, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

Petitioners seeking an injunction must show more than a possibility of irreparable harm; they must demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). Once the petitioner shows that irreparable harm is likely, the other injunction factors are assessed on a sliding scale. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir.2011). For instance, if, after demonstrating likely irreparable harm, a petitioner merely raises "serious questions going to the merits," then an injunction may issue when the balance of hardships tips sharply in the petitioner's favor and the petitioner shows that an injunction is in the public interest. *Id.* Even under the sliding scale approach, a showing on all four factors is required. *Id.* at 1135. When the Federal government is a party, the balance of equities and public interest factors may be merged. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir.2014). When a petitioner demonstrates a likelihood of irrepa-

rable harm to an endangered or threatened species, the balance of hardships and public interest factors tip strongly in favor of protecting the species. *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir.1987). However, courts must closely evaluate claims of harm to an endangered or threatened species and "tip the balance in favor of whatever action is in the best interest of the species, regardless of which party supports that action." *Alliance for the Wild Rockies v. Kruger*, 35 F.Supp.3d 1259, 1267, 2014 WL 3865936, *5 (D.Mont. Aug. 6, 2014).

## Discussion

The Court concludes that a preliminary injunction is not warranted in this case. Plaintiffs fail to make an adequate showing on any of the injunction factors, and the public interests and the balance of hardships clearly favor Defendants. Each of the injunction factors will be addressed in turn.

### 1. Irreparable Harm

Plaintiffs contend that they will suffer irreparable harm to their interest in using and enjoying the Project area as a result of the Project. Plaintiffs assert an interest in enjoying the Project area "in its undisturbed state for hiking, wildlife viewing, and engaging in vocational, scientific, spiritual and recreational activities." (Doc. 6–1 at 27.) Plaintiffs also contend that the Project will harm their interest in protecting the species and habitats that are found in the Project area.

Plaintiffs showing on the irreparable harm prong is similar to that asserted by environmental plaintiffs in many recent cases before this Court, a showing which the Court has referred to as "Plaintiffs' emaciated stock paragraph on irreparable harm." *Kruger*, 35 F.Supp.3d at 1269, 2014 WL 3865936, *7. Plaintiffs do not

provide evidence of any irreparable harm to any endangered, threatened, or proposed species or species habitat in the absence of an injunction. Indeed, no species covered by the Endangered Species Act is known to exist in the Project Area. Plaintiffs do not rebut the agencies' determination that the Project will not harm the Project Area's viability as a travel corridor for the threatened or proposed species that may occasionally move through the area.

 Plaintiffs' generalized allegations of an abstract environmental injury resulting from the Project's logging activities is insufficient to constitute irreparable harm required for an injunction. *Sierra Forest Legacy v. Sherman*, 951 F.Supp.2d 1100, 1111 (E.D.Cal.2013). "[A] plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n. 6 (9th Cir.2011). Logging is not per se sufficient to warrant an injunction, despite the fact that certain trees will be permanently removed from the forest. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir.2010).

To the extent that Plaintiffs' showing of irreparable harm is premised on damage to habitat in the Project Area generally, this conclusory allegation is undercut by the Forest Service's scientific determination that the resulting mosaic of forest habitat in the landscape is likely to be beneficial to wildlife, including grizzly bears and elk, because the relatively small forest openings resulting from the Project will provide improved foraging habitat for these and other species.

While Plaintiffs assert an interest in viewing and experiencing the forest in its "undisturbed state," conclusory allegations of an environmental injury, without more, are insufficient to meet the requirements for an injunction. Furthermore, in failing to demonstrate measurable harm to any wildlife species or their habitat, Plaintiffs' assertion of an environmental injury is vague, speculative, and insufficient to meet the standard for a showing of irreparable harm to their interests.

### 2. Likelihood of Success on the Merits

 Plaintiffs are unlikely to succeed on the merits. Whether Plaintiffs have demonstrated that there are serious questions going to the merits of their claims need not be decided because the public interests and the balance of the hardships tips in favor of the Defendants, and Plaintiffs have failed to demonstrate a likelihood of irreparable harm absent an injunction. *Cottrell*, 632 F.3d at 1134.

Plaintiffs' brief supporting the motion for a preliminary injunction asserts violations of the Endangered Species Act and the National Environmental Policy Act. Plaintiffs also assert violations of the National Forest Management Act, but fail to support this with any analysis. Though the Court will not engage in a lengthy discussion here of the merits of Plaintiffs' claims, the Court finds that Plaintiffs are unlikely to succeed on the merits. The administrative record discloses a thorough review of the potential impacts of the Project on all species of concern raised by Plaintiffs, and discloses a "hard look" at potential impacts on the environment.

Adverse impacts to lynx were determined to be insignificant based on, among others, the following considerations and scientific determinations: (1) lynx have not been documented in the Project area; (2) the Project is of relatively small size (harvest units total only 490 acres); (3) only 32 acres of potential snowshoe hare habitat will be affected; and (4) the Project com-

plies with the Northern Rocky Mountain Lynx Directive.

Adverse impacts to grizzly bears were determined to be insignificant based on, among others, the following considerations and scientific determinations: (1) the grizzly bear population of the NCDE is healthy and growing; (2) grizzly bears are not known to exist in the Project area; (3) Project impacts associated with increased human activity will be temporary; (4) Project impacts on hiding cover are minimal given that the dead trees are predicted to fall within 5 to 10 years even in the absence of harvest; (5) no new permanent roads will be built; (6) the Project is of relatively small size; and (7) grizzly bears are a habitat generalist that may actually benefit from new foraging opportunities resulting from Project activities.

Adverse impacts to wolverines were determined to be insignificant based on, among others, the following considerations and scientific determinations: (1) wolverines are not thought to be dependent on specific vegetation or habitat features that might be manipulated by land management activities; (2) wolverines are not known to exist in the Project area, and only 2 wolverines have been documented in the wider Continental Divide Landscape; (3) riparian sites where wolverines might locate prey will not be impaired; (4) the Project Area is not potential natal denning habitat; (5) the openings created by the Project would not deter wolverines from moving through the area; and (6) wolverines are a habitat generalist not averse to crossing unforested or lightly forest sites.

Plaintiffs also contend that cumulative effects were not adequately addressed, but fail to demonstrate a likelihood of success with regard to these claims. Specifically, Plaintiffs contend that the Clancy–Unionville project was inadequately addressed in the cumulative effects analysis. Defen-dants rebut this assertion by pointing to several places in the NEPA documents which address and discuss the Clancy–Unionville project. Plaintiffs also contend the Telegraph Project was inadequately addressed in the Project's cumulative effects analysis, but it is undisputed that the Telegraph Project was considered at some level and Defendants point to several places in the NEPA documents where the Telegraph Project is addressed and analyzed. Plaintiffs also fail to persuade that an unnamed, potential project, the size and specifics of which are apparently unknown, was required to be included in the cumulative effects analysis. This unnamed project had not yet been proposed when the Project was authorized. *See Environmental Protection Information Center v. U.S. Forest Service*, 451 F.3d 1005, 1014 (9th Cir.2006) (holding that USFS did not violate NEPA by failing to include project in cumulative effects analysis when "parameters of the [ ] project were unknown at the time of the EA").

Without addressing each and every one of Plaintiffs' arguments on the merits, and for the sake of judicial efficiency, suffice it to say that Plaintiffs fail to show that they are likely to succeed on the merits of their claims. The Court will now turn to the public interest and hardships factors, as these are decisive.

### 3. Public Interest and Balance of the Hardships

██ This is a case where the public interest factor is front and center. Of course, the public has a strong interest in the protection of threatened and endangered species. Plaintiffs, however, fail to demonstrate that any such species will be measurably harmed by Project activities. On the other hand, the threat of wildfire, a constant element of Montana life, is real. Experts in fire science, experienced wild-

fire fighters, and events in other western states prompted the authorization of this Project to ensure the protection of Helena's municipal water supply. This is a significant public interest.

The heavy fuel loading on the forest floor from the beetle-killed forest is undeniable and undisputed. Agency experts determined that a wildfire in the area around the Chessman Reservoir and Flume is likely to burn quickly, at high intensity, and be difficult to fight. Such a wildfire threatens to infuse large amounts of sediment and wildfire ash into the Chessman Reservoir, and ultimately cost the city of Helena and the State of Montana millions of dollars. A fire in the area also threatens to destroy or severely damage the Flume, which would take an estimated 23 months to repair. This is not a speculative doomsday scenario, but one experienced by other municipalities in western states. Plaintiffs' disagreements with the expert determinations of the agencies' wildfire scientists are not persuasive. Plaintiffs confuse the scientific data and site to inapposite studies. Even the documents Plaintiffs site in support of their argument, actually support Defendants. (See Doc. 6–16: "Once the trees fall to the ground, a fire burning through the area may burn very hot and damage the soils.")

The Project is also designed to protect the reservoir from intruding cattle and the threat of fecal-borne pathogens entering the water supply. Plaintiffs fail to address this important goal of the Project. Plaintiffs also fail to address the threat to the Flume from falling trees.

The public interest in protecting endangered and threatened species is "incalculable," *TVA v. Hill,* 437 U.S. 153, 187, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), but Plaintiffs offer nothing more than speculative harms to such species. The citizens of Montana's capital city obviously have a strong interest in protecting their municipal water supply. Indeed, Montana law reflects a strong public interest in protecting municipal water supplies from catastrophic wildfire. Mont.Code Ann. § 76–13–701(4). The threat to Helena's water supply from severe wildfire is supported by numerous agency and state experts and their collective experience. The Project is designed to address this threat while utilizing mitigating measures to ensure the continued viability and protection of wildlife species. Importantly, the Project does not authorize tree harvesting beyond that required to adequately address the threat to Helena's water supply. Every day of delay in implementing the Project exposes Helena's water supply to this continued threat. The public interest and the balance of the hardships favors Defendants.

Plaintiffs fail to make an adequate showing on any of the injunction factors. The motion is therefore denied.

IT IS ORDERED that Plaintiffs' motion for a preliminary injunction (Doc. 6) is DENIED.